## UNITED STATES *v.* MOSBY.

## MOSBY *v.* UNITED STATES.

### APPEALS FROM THE COURT OF CLAIMS.

Nos. 1112, 1420. Argued January 17, 1890. — Decided February 3, 1890.

question considered, as to what are "official services" performed by consuls, under the consular regulations of 1874 and 1881, prescribed by the President by virtue of the provisions of § 1745 of the Revised Statutes.

Fees collected by a consul for the examination of Chinese emigrants going to the United States on foreign vessels; and fees for certificates of shipment of merchandise in transit through the United States to other countries; and fees for recording instruments which are not official documents recorded in the record books required to be kept by the consul, but relate to private transactions for individuals not requiring the use of the consul's title or seal of office; and fees for cattle-disease certificates; and fees for acknowledgments and authentications of instruments certifying the official character and signature of notaries public; and fees for settling private estates; and fees for shipping and discharging seamen on foreign-built vessels sailing on the China coast under the United States flag; are not moneys which he is required to account for to the United States.

Fees collected by him for certifying extra copies of quadruplicate invoices of goods shipped to the United States; and money received for interest on public moneys deposited in bank; and fees collected for certificates of shipments or extra invoices; and fees for certifying invoices for free goods imported into the United States; are moneys which he is required to account for to the United States.

The practice of consuls to do acts which are not official is recognized by the statutes and the consular regulations.

The claimant had a judgment in the Court of Claims against the United States for $13,839.21. Both parties appealed. The items of the disallowance of which the claimant complained did not amount to more than $3000. But it was held that he could avail himself of anything in the case

which properly showed that the judgment was not for too large a sum; and this court, disallowing one of the items allowed to him, allowed one of the items disallowed, and rendered a judgment in his favor for a less amount than that rendered below.

THESE were appeals from a judgment in the Court of Claims in favor of Mosby against the United States. The case is stated in the opinion.

*Mr. John S. Mosby*, in person.

*Mr. Assistant Attorney General Maury* for the United States.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

This is a suit brought in the Court of Claims by John S. Mosby against the United States, claiming to recover the sum of $29,180.01, moneys which he had received while he was consul of the United States at Hong-Kong, from February 4, 1879, to July 21, 1885, and had paid into the treasury, the items composing the above sum being as follows: (1) For examining Chinese emigrants departing on foreign vessels for the United States, $5147; (2) for certifying extra copies or quadruplicate invoices, about $2000; (3) for certifying invoices for goods in transit through the United States to other countries, $5805; (4) for notarial and clerical work, $644.01; (5) for services to foreign-built vessels carrying the American flag, $584; and (6) for certifying invoices for goods exported to the United States which were on the free list, and for which no invoice was required by law as a condition of entry, about $15,000.

The petition alleged that those fees were paid voluntarily to the claimant by persons at whose request the services were performed, and were turned by him into the treasury, because he did not wish to involve himself in a controversy with the Department as long as he held a subordinate position in it, and because he was compelled to obey its orders or be dismissed from office and subjected to the imputation of appropriating money which did not belong to him; and that he credited the

fees to the treasury, relying on the good faith of the government to restore to him whatever belonged to him on a final settlement of his accounts.

The Court of Claims found the facts as follows:

"1. The claimant was consul of the United States at Hong-Kong from February, 1879, until July, 1885, and remained at his post until the latter date, when he returned to the United States.

"2. During his term he turned into the treasury the sum of $5147.00 on account of fees collected for examining Chinese emigrants going to the United States on foreign vessels; of this sum $3923.50 were collected prior to September 1, 1881, and $1223.50 were collected between September 1 and December 31, 1881. Said fees were voluntarily paid by the masters and charterers of said vessels at whose solicitation the service was rendered, and were collected in good faith by the consul.

"3. Soon after assuming charge of the consulate, to wit, February 21 and March 19, 1879, claimant informed the Department of State that, since the enactment of the law of February 19, 1862, prohibiting the coolie trade in which American vessels had been engaged, it had been the practice at Hong-Kong to procure for American and foreign vessels carrying Chinese passengers to the United States a consular certificate of the fact that they were free and voluntary emigrants. The claimant addressed said communications to the State Department to establish that the fees belonged to him, but paid into the treasury, before receiving a reply, the sum of $731.75. In reply to a claim that he, the consul, was entitled to such fees, the Secretary of State replied, in substance, that the fee is an official fee, and must be accounted for to the treasury.

"4. He gave written advice to the agent of the O. & O. S. S. Co., at Hong-Kong, to send steamships which were under the English flag without a consular certificate for the Chinese emigrants, as no law required it, and the agent declined to do so. A copy of his letter to the said agent was forwarded to the State Department. It does not appear that the Department replied to his communication accompanying said letter.

"5, The Bothwell Castle, an English steamship, sailed from Hong-Kong about January 6, 1882, carrying Chinese emigrants without the usual consular certificate of examination, but with a letter from the United States consul addressed to the collector at San Francisco, explaining why the master did not have it. Said vessel entered the port of San Francisco without trouble about February 1, 1882; all other foreign vessels after that time ceased to procure the said consular certificate. A copy of said letter to the collector at San Francisco was forwarded to the State Department; but claimant did not receive a reply. All emigration fees collected up to December 31, 1881, were turned into the Treasury.

" 6. The sum of $633.25 was collected in January, 1882, for examination of Chinese on foreign vessels, which was first credited and then charged back to the Treasury; and a letter was written by the claimant to the First Comptroller explaining that item in his accounts. The Comptroller allowed the item as a proper charge.

"7. The charterers of foreign vessels who had paid these fees to the consul afterwards applied to the Treasury to have them refunded, which was refused by the Comptroller on the ground 'that the collection of said fees was proper and they should not be refunded.'

" 8. The claimant, after his removal from office, claimed the emigration fees from foreign vessels. His claim was also disallowed. The fees collected subsequently to January 3, 1882, were refunded by the consul to the parties who paid them. The consul was not charged with the fees so refunded, or those he might have collected if he had not declined to continue the practice of examining Chinese emigrants on foreign vessels. The claimant refused to collect fees after receiving from the State Department notice that such fees must thereafter be accounted for as official fees. Said notice, in the form of a letter from the Department, was dated on said date, and reached claimant in due course of mail.

" 9. The claimant paid into the Treasury the sum of $5805 on account of fees received by him for certificates of shipment

of merchandise in transit through the United States to other countries.

"10.. The claimant paid into the Treasury the sum of $1592 for certifying extra copies or quadruplicate invoices of goods shipped to the United States.   The said sum was collected by claimant before the 1st day of September, 1881.

"11. He credited and paid to the Treasury $584 on account of fees collected for shipping and discharging seamen on foreign-built vessels sailing on the China coast under the United States flag.   He credited and paid into the Treasury $2095 on account of invoices certified by him for free goods imported into the United States.

"12. The claimant credited and paid into the Treasury fees aggregating $644.01, accruing as follows:

(a) Recording instruments at various times, between February 4,
    1879, and December 31, 1880................................ $39 29
(b) Cattle-disease certificates, collected in small items from time to
    time, between February 4, 1879, and September 30, 1880. ..... 152 00
(c) Interest on deposits at the bank (public moneys deposited be-
    tween February 4, 1879, and June 30, 1882) ................. 104 51
(d) Acknowledgments and authentications of instruments, collected
    from time to time in small quantities, between February 4,
    1879, and December 31, 1879, certifying official character and
    signature of notary public.............................. ..... 48 00
(e) Certificates of shipments, or extra invoices, collected during the
    December quarter, 1881, $2.50 each........................ 292 00
(f) Five per cent commission on the estate of Alice Evans, May,
    1881...................................................... 8 21

                                                   $644 01

"13. The payment by the claimant of these several sums of money into the Treasury was for the purpose of avoiding a controversy with the Department.   Soon after the claimant was removed from office, and before a final settlement of his accounts, he made a demand that all fees now claimed be credited to him.

"14. At the request of claimant's counsel, the following facts are also found: Said claimant wrote to the State Department, March 19, 1879, as stated in finding 3, in which communication he informed said Department that it had been

the habit of his predecessors to retain said fees as unofficial, and asked to be instructed whether he, the claimant, was not entitled to same. The said Department replied as follows: ' It is now deemed to be the more advisable course to prescribe the fee as an official one to be accounted for to the Treasury.' In instructions to said claimant, dated August 26, 1879, the said Department instructed claimant that the fees for acts which the consul is empowered but not required by law to perform and which relate only to private transactions are unofficial."

As conclusions of law, the court held that the claimant was entitled to recover, for item (1) in the petition, $5147; for item (3), $5805; for items *b*, *d*, and *f* in finding 12, being part of item (4), $208.21; for item (5), $584; and, as a part of item (6), $2095. It rejected the claim of $1592 for certifying extra copies or quadruplicate invoices of goods shipped to the United States, being the amount proved and found as to item (2); and also items *a*, *c*, and *e*, in finding 12, amounting to $435.80, being a part of the $644.01 in item (4). A judgment was rendered for the claimant for $13,839.21, from which both parties appealed. The opinion of the Court of Claims, disposing of the various matters involved, is reported in 24 C. Cl. 1.

It is provided as follows by section 1745 of the Revised Statutes: " The President is authorized to prescribe, from time to time, the rates or tariffs of fees to be charged for official services, and to designate what shall be regarded as official services, besides such as are expressly declared by law, in the business of the several legations, consulates, and commercial agencies, and to adapt the same, by such differences as may be necessary or proper, to each legation, consulate, or commercial agency; and it shall be the duty of all officers and persons connected with such legations, consulates, or commercial agencies to collect for such official services such and only such fees as may be prescribed for their respective legations, consulates, and commercial agencies, and such rates or tariffs shall be reported annually to Congress."

This section concerns itself wholly with " official services." The tariffs of fees to be prescribed by the President from time

to time are those to be charged for " official services." The President is to designate what are to be regarded as " official services," in addition to such as are expressly declared by law. The inhibition on consular officers, as to the collection of fees, is only against the collection, for " such official services," of other fees than the prescribed fees. It is not claimed by the United States in this case that the fees sued for by the claimant fall within the class mentioned in section 1745, of " such as are expressly declared by law." The question for determination is, whether the fees collected by the claimant, and paid into the Treasury, were fees for official services, within the regulations prescribed by the President under section 1745.

The claimant acted with propriety, and with a high sense of honor, in paying the fees into the Treasury, in order to avoid a controversy with the Department; and he asserted his right to have the fees refunded to him, by making a demand that they should be credited to him in his accounts, before such accounts were finally settled. He did not concede the right of the government to retain the fees; and his action was equivalent to a formal protest made at the time of paying them over. As is said by Judge Weldon, speaking for the Court of Claims in its opinion: "Public officers (upon the question of their compensation and the payment of money into the Treasury) are not bound, in order to save their rights, to place themselves in antagonism to the accounting officers of the Department, suffer themselves to be sued, and incur the odium, for the time, of being in default; but have the right to pay into the Treasury the disputed moneys, and then seek the courts to adjust and determine their claims against their superior and sovereign." Nothing done in the present case can amount to an estoppel against the claimant.

Part of the fees in question accrued while the consular regulations of 1874 were in force, and part under those of 1881. These regulations must be considered in regard to each specific item.

1. As to item (1), $5147, the facts relating to that item are in findings 2 to 8, both inclusive. The consular regulations of

1874 were prescribed by the President on September 1, 1874, and those of 1881 on May 1, 1881.

Paragraph 321 of the regulations of 1874 is as follows: "321. All acts are to be regarded as 'official services,' when the consul is required to use his seal and title officially, or either of them; and the fees received therefor are to be accounted for to the Treasury of the United States." It is to be observed that this paragraph uses the word "required," and does not say that all acts are to be regarded as official services when the consul uses his seal and title officially, or either of them.

Paragraph 333 of those regulations contains a tariff of fees for 107 different services; but none of them specifies the fee for an examination of Chinese emigrants going to the United States on foreign vessels.

Paragraph 489 of the regulations of 1881 reads as follows: "489. All acts or services for which a fee is prescribed in the tariff of fees are to be regarded as *official* services, and the fees received therefor are to be reported and accounted for to the Treasury of the United States, except when otherwise expressly stated therein."

Paragraph 496 in those regulations says: "The following is the revised tariff of official fees, prescribed by order of the President, and to be observed by all consular officers." Among 106 items contained in that tariff, item 35 prescribes a fee of 25 cents for a certificate "to the examination required by section 2162 of the Revised Statutes, for each emigrant. (Art. 21.)" Section 2162 of the Revised Statutes, in connection with section 2158, provides for a certificate to be signed by the consul of the United States residing at the port from which any vessel registered, enrolled or licensed in the United States may take her departure, carrying a subject of China, Japan or any other Oriental country, known as a coolie, containing his name, and setting forth the fact of his voluntary emigration from such port, such certificate to be given to the master of the vessel, and not to be given until the consul is first personally satisfied by evidence of the truth of the facts therein contained. These provisions do not refer to

foreign vessels. Article 21 of the regulations of 1881, referred to in item 35 of paragraph 496, embraces seven paragraphs, and is headed: "Duties as to American Vessels engaged in the Transportation of Chinese and other Emigrants;" and the article expressly states that the duties of the consul under it apply to vessels of the United States. Article 18 of the regulations of 1874 is to the same purport as article 21 of the regulations of 1881.

Neither in the regulations of 1874 nor in those of 1881 is there any designation, as an official service, of the examination of the subjects of China, Japan or any other Oriental country, known as coolies, carried as passengers on board of any vessel other than a vessel registered, enrolled or licensed in the United States. Therefore, the consul, in examining Chinese emigrants going to the United States on foreign vessels, did not perform a service required by law or by the regulations, or any service specified in any tariff of fees, or any official service. The fees received for such service, being paid voluntarily to the consul by the person to whom it was rendered, became the private property of the consul and not the money of the United States. This view is not varied by the fact that the person employed the consul to render the service because he was consul, or by the fact that the consul attached his seal as evidence of his official character; because he was not required by any law or regulation to use either his seal or his title of office officially, nor was any fee prescribed for the service in any tariff of fees.

The practice of consuls to do acts which are not official is recognized in several places in the consular regulations of 1874, as in paragraphs 296 and 297, where it is stated that consuls are at liberty to examine titles for their countrymen at home, "or to do other services for them in a foreign land," "for a private compensation, if it does not interfere with the performance of their official duties;" in paragraph 308, the performing of notarial acts; in paragraph 309, the taking the acknowledgment of deeds, and the taking of depositions and affidavits under the laws of the States and Territories of the Union, for use as evidence in such States and Territories,

respectively; in paragraph 310, the execution of a commission for taking testimony under the authority of a state or territorial tribunal, which function paragraph 311 states "is regarded as outside of the regular duties and responsibility of a consular officer," and in regard to which paragraph 312 states as follows: "It is to be understood that in such cases the consular officer does not act in his quality of an agent of the Federal Government, but simply as a citizen of the United States whose local position and character render him available to his fellow-citizens for such services as might have been rendered by a private individual. He should make himself as useful as he can to his fellow-citizens, without giving offence to the government which gives him his exequatur. But it must be understood in all such cases that he acts as a private citizen, and that the government cannot in any way be made responsible for his acts."

Like provisions are found in paragraphs 471 to 477 of the consular regulations of 1881; and paragraph 478 of the latter says: "The compensation or fee of a consular officer for performing a notarial service, executing a judicial commission, or letters rogatory, or the unofficial services referred to in paragraphs 471, 472 and 475, is not an official but a personal fee, for which he is not responsible to the government as for official fees, unless the service, or a part of it, is one for which a fee is prescribed in the Tariff of Fees. In that case he must account to the government for the fee prescribed in the tariff."

Section 1724 of the Revised Statutes makes a consul liable for the omission to collect any fees "which he is entitled to charge for any official service." By section 1726 it is made the duty of a consular officer to "give receipts for all fees collected for his official services;" by section 1727, to keep a fee-book for the registry of "all fees so received by him;" and by section 1728, to render with his account of fees received a full transcript of such register, and make oath that it contains "a full and accurate statement of all fees received by him, or for his use, for his official services as such consular officer, during the period for which it purports to be rendered."

It is quite clear, therefore, that the statutes and regulations make a distinction between official and unofficial services rendered by a consul.

The allowance to the claimant of the item of $5147 was, therefore, proper.

2. The next item, but which was disallowed, is $1592, for certifying extra copies of quadruplicate invoices of goods shipped to the United States, and which sum was collected by the claimant before the 1st of September, 1881, and is covered by finding 10. It is stated in the opinion of the Court of Claims that all such fees paid after the regulations of 1881 took effect have been refunded, and are not now in controversy.

Sections 2853 and 2855 of the Revised Statutes, as they stood prior to the 1st of July, 1880, when the act of June 10, 1880, c. 190 (21 Stat. 173), took effect, provided as follows: "Sec. 2853. All invoices of merchandise imported from any foreign country shall be made in triplicate, and signed by the person owning or shipping such merchandise, if the same has actually been purchased, or by the manufacturer or owner thereof, if the same has been procured otherwise than by purchase, or by the duly authorized agent of such purchaser, manufacturer or owner." "Sec. 2855. The person so producing such invoice shall at the same time declare to such consul, vice-consul or commercial agent the port in the United States at which it is intended to make entry of merchandise; whereupon the consul, vice-consul or commercial agent shall endorse upon each of the triplicates a certificate, under his hand and official seal, stating that the invoice has been produced to him, with the date of such production, and the name of the person by whom the same was produced, and the port in the United States at which it shall be the declared intention to make entry of the merchandise therein mentioned. The consul, vice-consul or commercial agent shall then deliver to the person producing the same, one of the triplicates, to be used in making entry of the merchandise; shall file another in his office, to be there carefully preserved; and shall, as soon as practicable, transmit the remaining one to the collector of the port of the

United States at which it shall be declared to be the intention to make entry of the merchandise."

Paragraph 491 of the consular regulations of 1874 reads as follows: "491. Consular officers will, on request of the proper collectors, supply them, free of charge, with copies of any such documents on file in their offices as they may need in the discharge of their official duties. Copies prepared by other persons for their own use will, on request, be certified on payment of two dollars. When, however, duplicates of originals are required, or the copy is prepared by the consul, the schedule fee will be exacted as for original service." A like provision is found in paragraph 668 of the regulations of 1881.

By section 4 of the act of June 10, 1880, before referred to, it was provided that sections 2853 and 2855 of the Revised Statutes should be so amended as to require that all invoices of merchandise imported from any foreign country and intended to be transported without appraisement to any of the ports mentioned in section 7 of that act, should be made in quadruplicate, and that the consul, vice-consul or commercial agent, to whom the same should be produced, should certify each of said quadruplicates under his hand and official seal in the manner required by section 2855, and should "then deliver to the person producing the same two of the quadruplicates, one to be used in making entry at the port of first arrival of the merchandise in the United States, and one to be used in making entry at the port of destination, file another in his office, there to be carefully preserved, and as soon as practicable, transmit the remaining one to the collector or surveyor of the port of final destination of the merchandise: *Provided, however,* That no additional fee shall be collected on account of any service performed under the requirements of this section."

By item 36 of the tariff of fees in paragraph 333 of the regulations of 1874, a fee of $2.50 is prescribed for a certificate "to invoice, including declaration, in triplicate." Nothing is there said as to a fee for a copy of an invoice, but in paragraph 491, before quoted, a fee of $2 is prescribed for a certificate to a copy of a document on file in the office of a consular officer, which would include an invoice. In the tariff of fees in para-

graph 496 of the regulations of 1881, in item 36, a like fee of
$2.50 is prescribed for a certificate "to invoice, including
declaration, in triplicate," and a like fee of $2 under paragraph
668 of the regulations of 1881.

The charges which make up the $1592 are manifestly for
official services, which can be performed only under the hand
of the consul and his seal of office to the certificate. As is
said by the Court of Claims: "The act pertains to a duty
specifically prescribed by the laws of the United States, and,
upon a tender of the fee, the party making application is
entitled to have a certificate attached to the instrument, if it
is a copy of the document executed in triplicate. The party
being entitled to the certificate, it is the duty of the officer to
attach his official seal upon payment of the fees. This is an
official duty, and the emolument becomes an official fee."
The item of $1592 was, therefore, properly disallowed.

3. The item of $5805, which was allowed, is covered by find-
ing 9, and is for fees received for certificates of shipment of
merchandise in transit through the United States to other
countries. These were not the invoices referred to in sec-
tions 2853 and 2855 of the Revised Statutes, either as they
originally stood or as they were amended by the act of June
10, 1880. The law did not require the consul to issue those
certificates; no provision was made for a fee for them in the
regulations of 1874, or in those of 1881; and it does not appear
that the regulations of the Treasury Department required a
consul to perform any duty in relation to such goods. This
item was, therefore, properly allowed.

4. The next item, $644.01, relates to fees "for notarial and
clerical work," being six items covered by finding 12. Of
these, item a, being fees collected for "recording instruments
at various times, between February 4, 1879, and December 31,
1880, $39.29," was disallowed. This item was rejected by the
Court of Claims because it did not appear, from the specifica-
tion or proof, what was the character of the instruments
recorded, and because it was, therefore, said to be impossible
to determine whether the recording came within the regula-
tions of 1874 or those of 1881, and because, for aught that

appeared, the instruments might have been those specially provided for by the tariff of fees in the regulations.

But we think the Court of Claims erred in rejecting that item. The fees accrued from February 4, 1879, to December 31, 1880, while the regulations of 1874 were in force. Article 25 of those regulations, headed " Record-Books and Archives," in paragraphs 398 to 414, requires that a consul shall keep various books of records. Of course, the fees in question were not for keeping such record books or for recording in them the instruments which were recorded in them, because such instruments were all of them official documents, and the fact that the item covers fees collected by the consul for recording instruments and paid into the Treasury shows that the recording did not relate to official instruments, or to official acts, but related to private transactions for individuals, not requiring the use of the consul's title or seal of office. This item should have been allowed.

Item *b* in finding 12, which was allowed, is for " Cattle-disease certificates, collected in small items from time to time, between February 4, 1879, and September 30, 1880, $152." It was properly allowed, as there is nothing in the statutes or in the regulations in relation to the duties or powers of a consul as to " cattle-disease" or certificates respecting the same.

Item *c*, in finding 12 is " Interest on deposits at the bank, (public moneys deposited between February 4, 1879, and June 30, 1882,) $104.51." This was disallowed, and we think properly. The moneys are stated to be " public moneys," in respect to which the consul was a trustee, and any interest which he received on the funds belonged to the United States. He was not required to put the funds out at interest, but if he did so, the accretion belonged to the government.

Item *d* in finding 12, which was allowed, is for " Acknowledgments and authentications of instruments, collected from time to time in small quantities, between February 4, 1879, and December 31, 1879, certifying official character and signature of notary public, $48." These were not official services required by statute or the regulations, and were rendered to

persons who requested their performance. The allowance of this item was proper.

Item *e* in finding 12, which was disallowed, is for "Certificates of shipments, or extra invoices, collected during the December quarter, 1881, $2.50 each, $292." This disallowance was proper, for the reasons stated in regard to the item of $1592.

Item *f* in finding 12 is for "Five per cent commission on the estate of Alice Evans, May, 1881, $8.21." This evidently was a fee in the settlement of a private estate, and was properly allowed.

Thus, of the $644.01 in finding 12, items *a, b, d* and *f* are allowable, amounting in all to $247.50, instead of $208.21 allowed by the Court of Claims.

5. The next item, and which was allowed, is $584 on account of fees collected for shipping and discharging seamen on foreign-built vessels sailing on the China coast under the United States flag, and is covered by finding 11. The claimant insists that, while he had authority to perform those services, he was not required to do so by any statute or regulation.

Paragraph 194 of the regulations of 1881 says: "194. In the case of American or foreign-built vessels purchased abroad and wholly owned by American citizens, it is known that the crews are usually made up of men who are not American citizens, and who have not acquired the character of American seamen under the law and as set forth in paragraph 199. Seamen of this class, when not serving under a contract made in the United States, are not regarded as within the jurisdiction of a consular officer as to their shipment or discharge."

In paragraph 131 of the regulations of 1874, it is said, that the statutory authority of a consul to act in respect to the discharge of seamen from a vessel of the United States clearing from a port of the United States, is limited to "1st. The sale in a foreign country of a ship or vessel belonging to a citizen of the United States. 2d. The discharge, with his own consent, of a seaman or mariner, being a citizen of the United States. 3d. A discharge after a survey of the vessel, and finding the same unseaworthy."

In the present case, what the consul did was to ship and discharge seamen on foreign-built vessels sailing on the China coast under the United States flag. It must be taken that these seamen were not American citizens, and that the vessel did not clear from a port of the United States, so as to come within the provisions of paragraphs 128, 129, 130 and 131 of the regulations of 1874. The item of $584 was therefore properly allowed.

6. The next item allowed was one of $2095, for certifying invoices "for free goods imported into the United States," and is covered by finding 11. This allowance seems to have proceeded upon the view that the law did not require an invoice of goods which were not subject to duty; that the consul had no official duty to perform in respect to an invoice of such goods; that the service was performed at the instance of the shipper, and for his convenience; that the matter was one purely personal between the consul and the party who paid the fee for the certificate; and that, as the government was not interested in the goods, the consul was under no obligation to account to the United States for the fees.

We think this view was erroneous. By section 2853 of the Revised Statutes, " all invoices of merchandise imported from any foreign country " are to be made in triplicate, whether the goods have actually been purchased or have been procured otherwise than by purchase. By section 2854 " all such invoices " are required, before the merchandise is shipped, to be produced to the proper consul. By section 2855, the person producing " such invoice " is to make a specified declaration, and the consul is to endorse upon each of the triplicates a specified certificate, and is to transmit one of the triplicates " to the collector of the port of the United States at which it shall be declared to be the intention to make entry of the merchandise." By section 2860, it is provided that, except as allowed in the four preceding sections, which do not apply to the present question, " no merchandise imported from any foreign place or country shall be admitted to an entry unless the invoice presented in all respects conforms to the requirements " of sections 2853, 2854 and 2855, and has thereon the certificate of the consul specified in those sections, nor unless the invoice is verified, at the time of making the entry, by a specified

oath, nor unless the triplicate transmitted by the consul to the collector has been received by him. By section 2851, a consul is entitled to demand and receive a fee of $2.50 for taking the verification of an invoice and making the certificate. It is quite clear, therefore, that there can be no entry without a properly certified invoice.

By paragraph 462 of the regulations of 1874 and paragraph 637 of those of 1881, "all invoices of importations from countries in which there are" consular officers, "must, before the shipment of the merchandise, be produced to and authenticated by the United States consular officer nearest the place of shipment for the United States."

In addition to this, it is entirely clear, that the question of determining whether goods to be shipped will, when imported into the United States, be free from duty, is a question which could not be left to the determination of a consul. It often involves intricate points of fact and of law, and must be as wholly cognizable by the proper officers and tribunals of the United States, appointed for the purpose, as the question of the proper rate of duty on dutiable goods.

The item of $2095 was, therefore, improperly allowed.

It results, therefore, that the items to be allowed are $5147, $5805, $247.50 and $584, being an aggregate of $11,783.50.

It is contended for the United States that the claimant has no right to appeal in regard to the items which he claims were improperly disallowed, because they do not in the aggregate amount to more than $3000. But we are of opinion that, as section 707 of the Revised Statutes authorizes an appeal to this court on behalf of the United States, from all judgments of the Court of Claims adverse to the United States, and as the appeal by the United States in this case is from the judgment of $13,839.21 in favor of the claimant, it is competent for the claimant, as he also has taken an appeal from that judgment, to avail himself of anything in the case which properly shows that that judgment was not for too large a sum.

*The judgment of the Court of Claims is reversed, and the case is remanded to that court with a direction to enter a judgment in favor of the claimant for $11,783.50.*