**Sybil YOUNG and Roderick Young, Plaintiffs–Appellants,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, Defendant–Appellee.**

**Sybil YOUNG and Roderick Young, Plaintiffs–Appellants,**

v.

**CHEMICAL BANK, N.A., Defendant–Appellee.**

Nos. 1042, 1052, Dockets 88–6314, 88–6318.

United States Court of Appeals, Second Circuit.

Argued May 4, 1989.

Decided Aug. 8, 1989.

As Amended Aug. 30, 1989.

Stuart Potter (Claudia Conway, Butler, Fitzgerald & Potter, New York City, of counsel), for plaintiffs-appellants Sybil and Roderick Young.

Gabriel W. Gorenstein, Asst. U.S. Atty., S.D.N.Y., New York City (Benito Romano, U.S. Atty., S.D.N.Y., Edward T. Ferguson, III, Asst. U.S. Atty., S.D.N.Y., New York City, of counsel), for defendant-appellee U.S. Dept. of Justice.

Barbara E. Daniele, Asst. Gen. Counsel, Chemical Bank, N.A., New York City, for defendant-appellee Chemical Bank, N.A.

Before FEINBERG and NEWMAN, Circuit Judges, and TENNEY, District Judge.*

TENNEY, District Judge:

In these cases, we examine the extent to which federal and state privacy laws restrict the ability of the federal government and banks to assist investigations in foreign countries. Plaintiffs appeal from judgments of the District Court for the Southern District of New York (John F. Keenan, Judge) dismissing these actions pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim for relief. We affirm in the case against the United States Department of Justice and modify the judgment in the case against Chemical Bank.

## BACKGROUND

Appellants Sybil Young, a British citizen, and her husband Roderick, a citizen of Bermuda, operated several businesses in Bermuda. Sometime around 1981, Mrs. Young opened a checking account at a branch of Chemical Bank ("Chemical") in New York City. From 1981 to 1986, she regularly deposited large amounts of cash and traveler's checks in her Chemical account by registered mail. Chemical's management became suspicious of the size and frequency of these deposits but a background check on Mrs. Young failed to disclose any criminal history.

The deposits continued to arrive and Chemical continued to process them for some time, despite its concerns. Chemical finally refused to accept any more deposits after an incident in August 1986, when Mr. Young personally appeared at the bank with approximately $35,000 in traveler's checks for deposit to his wife's account. A Chemical officer told Mr. Young that Chemical would not accept the deposit. The discussion turned into an argument,

---

* The Honorable Charles H. Tenney, of the United States District Court for the Southern District of New York, sitting by designation.

and Mr. Young left the bank. That night he placed the checks in the night deposit slot. Chemical did not process the checks when they were discovered the next day. Instead, it mailed them back to Mrs. Young in Bermuda.

Sometime during the next two or three months, Sol Froomkin, the Attorney General of Bermuda, received information from an informant that the Youngs were violating Bermuda's currency control laws. The identity of the informant has not been revealed but the Youngs allege that it was a representative of Chemical. In any event, on the basis of this tip, Froomkin initiated an investigation into the Youngs' banking activities with Chemical.

In connection with the investigation, representatives from Froomkin's office asked Chemical for information pertaining to Mrs. Young's account. They were told that Chemical would provide it only if compelled by subpoena. Froomkin telephoned the Office of the United States Attorney for the Southern District of New York for help and was referred to David Denton, the Executive Assistant United States Attorney. Denton eventually applied for, and was granted, an order from the District Court for the Southern District of New York appointing him a commissioner empowered to obtain evidence relevant to Froomkin's investigation. Under this authority, Denton obtained the account information with a court-ordered subpoena. He provided this evidence, along with other material acquired pursuant to his commission, to Froomkin, who used it to obtain an indictment against the Youngs. Eventually, the Youngs both pleaded guilty to numerous violations of Bermuda law.

After their convictions, the Youngs initiated separate actions against the United States Department of Justice (the "Government") and Chemical, claiming that each had violated the Right to Financial Privacy Act, 12 U.S.C. §§ 3401–22 (1983 & Supp. 1988) ("RFPA" or the "Act") by failing to comply with certain provisions that the Youngs assert should have regulated the release of Mrs. Young's account information to the Government. In the action against Chemical, the Youngs also asserted claims based on confidentiality theories. The district court dismissed both lawsuits. It held that the Government was merely serving as a "conduit" for the Bermuda government when it obtained the account information and was, therefore, not a "government authority" within the meaning of the Act. The court also found, as a matter of New York State law, that appellants had no cause of action against Chemical arising from an alleged breach of confidentiality. The Youngs appeal from both dismissals.

## DISCUSSION

### A. Applicability of the RFPA to Court-Appointed Commissioners

Persons involved in foreign legal proceedings, who seek evidence located in the United States, may obtain it using letters rogatory or less-cumbersome requests for court-appointed commissioners, the ancient tools of international litigation. *See United States v. Mosby*, 133 U.S. 273, 282, 10 S.Ct. 327, 831, 33 L.Ed. 625 (1890); *Nelson v. United States*, 17 F. Cas. 1340, 1341 (C.C.D. Pa. 1816) (No. 10,116); *Spanish Consul's Petition*, 22 F. Cas. 854, 854 (S.D.N.Y. 1867) (No. 13,202); 4 J. Moore, J. Lucas & T. Currier, *Moore's Federal Practice* ¶ 28.09[2] (2d ed. 1989) [hereinafter *Moore's*].[1] Private individuals may be appointed commissioners, *see In re Letter of Request for Judicial Assistance from the*

---

1. The procedures governing such appointments are now codified in 28 U.S.C. § 1782(a) (1983), which provides:

 The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign

 or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. *See also* 22 C.F.R. § 92.67 (1988).

*Tribunal Civil de Port–au–Prince, Republic of Haiti,* 669 F.Supp. 403, 407 (S.D.Fla. 1987), but, as in this case, foreign governments typically turn to law-enforcement authorities for help in criminal matters. *See, e.g., In re Request for Assistance from Ministry of Legal Affairs of Trinidad and Tobago,* 848 F.2d 1151, 1152 (11th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 784, 102 L.Ed.2d 776 (1989) [hereinafter *Trinidad and Tobago* ]; *In re Request for International Judicial Assistance (Letter Rogatory) From the Federative Republic of Brazil,* 700 F.Supp. 723, 725 (S.D.N.Y.1988) [hereinafter *Republic of Brazil* ]. These cases require us to determine the applicability of the RFPA to law-enforcement officials who have been designated commissioners in such circumstances.

### 1. *Scope of the RFPA*

 The RFPA provides, in pertinent part:

> [N]o Government authority may have access to or obtain copies of, or [sic] the information contained in the financial records of any customer from a financial institution unless ... such customer has authorized such disclosure ... [or] such financial records are disclosed in response to a judicial subpena which meets the requirements of ... this title....

12 U.S.C. § 3402. The RFPA defines a "government authority" as "any agency or department of the United States, or any officer, employee, or agent thereof." *Id.* § 3401(3). Were there no other circumstances for us to consider, we would have to find that Denton, as a Justice Department employee, fell within this definition. The district court found, however, that Denton was not specifically acting in that capacity when he obtained this information from Chemical. The specific question before us, therefore, is whether the RFPA applies when persons who would otherwise qualify as "government authorities" under the RFPA are appointed commissioners and, in that capacity, seek to obtain information from financial institutions with court-ordered subpoenas. We hold that it does not.

Initially, we note that Congress never considered the question before us when it enacted the RFPA. For example, the Act does not contain a single reference to commissioners or letters rogatory, and nothing in the legislative history suggests that Congress weighed the possible impact of the Act on either of these procedures. Our determination of how broadly to construe the RFPA is made somewhat difficult by the absence of a clearly articulated purpose behind it. Certainly, a significant motivating factor for Congress was the Supreme Court's decision in *United States v. Miller,* 425 U.S. 435, 440, 96 S.Ct. 1619, 1622, 48 L.Ed.2d 71 (1976), in which the Court held that bank customers have no reasonable expectation of privacy, under the fourth amendment, in bank records of their accounts. *See* H.R.Rep. No. 1383, 95th Cong., 2d Sess. 34 (1978) [hereinafter H. Rep.], *reprinted in* 1978 U.S.Code Cong. & Admin.News 9273, 9306 [hereinafter Code News]. The House Report accompanying the Act, for example, specifically disapproved of the *Miller* Court's failure to "acknowledge the sensitive nature of these records...." *Id.*

Nevertheless, it would be reading too much into the Act to conclude that Congress intended to cloak bank records with an impenetrable veil of privacy in all contexts. As the House Report explains:

> [The Act] is intended to protect the customers of financial institutions from unwarranted intrusion into their records while at the same time permitting legitimate law enforcement activity. Therefore, [it] seeks to strike a balance between customers' right of privacy and the need of law enforcement agencies to obtain financial records pursuant to legitimate investigations.

H. Rep. at 33, *reprinted in* Code News at 9305. Congress determined that the best way to protect financial records from unwarranted governmental intrusion without crippling legitimate criminal investigations was to regulate the government's access. Yet, it observed that grand jury subpoenas, the mechanism of disclosure in *Miller,* have always been subject to judicial review. It

exempted them from the Act after it decided the safeguards already in place would adequately protect against abuse. *See* 12 U.S.C. § 3413(i); H. Rep. at 35, *reprinted in* Code News at 9307; *id.* at 228, *reprinted in* Code News at 9358; *In re Grand Jury Subpoena Duces Tecum*, 767 F.2d 26, 30 (2d Cir.1985).

■ Therefore, we believe Congress intended the RFPA to regulate the release of customer information from financial institutions in circumstances where adequate controls did not already exist. The subpoena served on Chemical, "so-ordered" by a district court, was not in this category because it was subject to judicial review even before it was served.[2] It thus received the same, if not higher, level of scrutiny given grand jury subpoenas. Construing the Act so as not to apply in such circumstances would be consistent with congressional intent.

Such an interpretation would also further related congressional goals. Congress has long recognized the freedom of individuals to provide information voluntarily for use in foreign proceedings. *See* 28 U.S.C. § 1782(b). The Act reveals Congress' objective of encouraging voluntary cooperation with law enforcement agencies. For example, Congress specifically exempted "tips" to law enforcement authorities by banks that suspect a customer of engaging in criminal activity. 12 U.S.C. § 3403(c).[3] In fact, it felt so strongly about encouraging voluntary cooperation that it subsequently added a provision preempting any other state or federal law to the contrary. *Id.* § 3403(c) (Supp.1988). In addition, it declined to adopt certain provisions that would have restricted the ability of government authorities to share information acquired under the Act with other agencies. It did so, in part, out of concern that the provisions would also restrict the ability of law enforcement groups to share evidence of criminal activity with foreign governments. *See Hearings on S. 2096 Before the Subcomm. on Financial Institutions*, 95th Cong., 2d Sess., 235–36 (1978) (statement of Hon. Harold M. Williams, Chairman of the Securities and Exchange Commission).

In 1964, Congress amended the statute governing foreign requests to enable the government to take a greater role in rendering assistance to foreign governments with the objective of stimulating reciprocal aid. *See* S.Rep. No. 1580, 88th Cong., 2d Sess. 7, *reprinted in* 1964 U.S.Code Cong. & Admin. News 3782, 3788; *In re Letter of Request From the Crown Prosecution Service of the United Kingdom*, 870 F.2d 686, 690 (D.C.Cir.1989); *Trinidad and Tobago*, 848 F.2d at 1154; *In re Request for Judicial Assistance From Seoul Dist. Criminal Court*, 428 F.Supp. 109, 112 (N.D.Cal.), *aff'd*, 555 F.2d 720 (9th Cir. 1977). The facts in this case illustrate the significance of that goal.[4] By limiting the application of the Act to "government authorities," Congress left untouched the activities of private commissioners, who—as appellants concede—may act on behalf of foreign governments without restriction by the RFPA. Since obtaining bank information appears to be one of the most common activities undertaken by commissioners, *see, e.g., Trinidad and Tobago*, 848 F.2d at 1152; *Fonseca v. Blumenthal*, 620 F.2d 322, 323 (2d Cir.1980); *Republic of Brazil*, 700 F.Supp. at 725–26, appellants' interpretation would leave private commissioners

---

**2.** We need not decide whether the subpoena was validly issued. The issues raised by appellants concerning the validity of the subpoena do not vitiate Denton's status as a commissioner.

**3.** The information that may be disclosed is limited to the customer's identity or account number and the nature of the suspected illegal activity. 12 U.S.C. § 3403(c) (Supp.1988).

**4.** At one point, Froomkin expressed some frustration over the delay in Denton's appointment as a commissioner. He wrote:

This matter is becoming somewhat embarrassing for me, since officials here are quering [sic] why we cannot get prompt assistance from the U.S., when in fact we in Bermuda invariably give requests from the U.S. the highest priority.

Letter from Sol M. Froomkin, Q.C., to David W. Denton, Esq., dated December 24, 1986 (Jt. App. (Young v. Department of Justice) 26).

with greater powers in this important area than the law enforcement organizations traditionally contacted by foreign governments. The real possibility that foreign governments would begin to turn to private commissioners for assistance would undermine the government's ability to obtain reciprocal cooperation. Absent some indication that Congress even considered the issue, we are reluctant to give the Act an interpretation that would frustrate this independent objective. *See Lieberman v. Federal Trade Comm'n*, 771 F.2d 32, 40 (2d Cir.1985).

In addition, we do not understand how appellants can claim that their interpretation of the Act would provide any additional protection. If the Government had not been able to obtain the account information in this case, Bermuda would simply have turned to a private commissioner, and the Youngs would still have been indicted and convicted.[5] Moreover, restricting the opportunity for representatives of the Government to serve as commissioners would not necessarily prevent it from obtaining financial records without complying with the RFPA. If Bermuda had chosen a private commissioner, nothing would have prevented it from sending copies of the account information to the Government on its own initiative or even upon the request of the Government. The impact on the Young's privacy interests in the account records would thus have been the same regardless of whether the information had been transmitted to Bermuda by a federal employee or a private commissioner.

Appellants argue that our decision will, nonetheless, increase the potential for Government abuse. They claim that it will provide a method for the Government to obtain information from banks when it cannot meet the requirements of the RFPA. We are aware that were it not for Bermuda's request for assistance, the Government might not have been able to obtain the Youngs' account information from Chemical.[6] The actual risk of abuse, however, is quite low. The Government's opportunity for manipulation is limited by the fact that a representative may apply for a commission only upon the request of a foreign party, and then only when the requesting party can adequately establish that the evidence sought will be used in a foreign tribunal. *See In re Doe*, 860 F.2d 40, 48 (2d Cir.1988); *Fonseca*, 620 F.2d at 323–24; *In the Matter of Letters Rogatory Issued by the Director of Inspection of the Government of India*, 385 F.2d 1017, 1019 (2d Cir.1967). Therefore, we do not share appellants' concerns.[7]

Nor do we find the precedent they cite persuasive. Their primary support is a footnote in an Eleventh Circuit opinion, which, in dictum, did no more than note that the commissioner involved would comply with the RFPA. *See Trinidad and Tobago*, 848 F.2d at 1156 n. 12. The other is an opinion in which a district court noted the lack of analysis in the Eleventh Circuit footnote but decided to adopt it anyway. *See Republic of Brazil*, 700 F.Supp. at 725–26. Even in that case, however, the issue was not central to the controversy before the court, which essentially required that the expected release of information should occur in accordance with the terms of the RFPA. To the extent that these decisions stand for the proposition that the RFPA applies to the activities of court-ap-

---

**5.** Since the issue is not before us, we express no opinion on whether a lawful prosecution could or should be recognized as an "injury."

**6.** The record does not reveal any violations of United States law by the Youngs. Therefore, it is possible that the Government could not have obtained Mrs. Young's account information through the grand jury process.

**7.** The Government presently retains the account information in a special file and has stated that it has no present interest in investigating the Youngs. Jt. App. (Young v. Chemical Bank)

119–20. If it later changed its mind, however, we recognize that it would be far easier for investigators to open a file drawer than to use other methods to obtain this information. In light of that possibility, it might be appropriate for district courts to include in orders granting commissions to representatives of the Government a provision requiring the commissioner to seal all retained copies of applicable bank records as soon as they are transmitted to the requesting party or, at the latest, upon the expiration of the commission.

pointed commissioners, however, we decline to follow them.

In conclusion, we hold that the RFPA does not apply to court-appointed commissioners, who would otherwise qualify as "government authorities" under the RFPA, when they seek information from financial institutions with court-ordered subpoenas.

### 2. Judicial Estoppel

■ Appellants assert that the Government should be precluded under the judicial estoppel doctrine from arguing that the Act does not apply. During discussions with Denton, Chemical indicated that, absent a court order to the contrary, it would ordinarily notify Mrs. Young that it had received a subpoena pertaining to her account. When informed of this, Froomkin told Denton that any such disclosure would jeopardize the ongoing investigation in Bermuda. Denton decided to seek an order preventing Chemical's planned notification of Mrs. Young. The trouble is, the Government believed then, as it argues now, that the RFPA did not apply to its activities on behalf of Bermuda. Nevertheless, Denton applied for, and was granted, the order under section 3409 of the RFPA, which provides authority for a court to delay the notification otherwise required under the Act. *See* 12 U.S.C. § 3409(a). Appellants urge that, in light of the Government's affirmative use of this favorable provision, it cannot claim now that the Act does not apply.

Since appellants did not assert the judicial estoppel argument before the district court, we would not ordinarily consider the claim. *See Fleming v. New York University*, 865 F.2d 478, 481–82 (2d Cir.1989); *Grace Towers Tenants Ass'n v. Grace Housing Development Fund Co.*, 538 F.2d 491, 495 (2d Cir.1976). We have some reservations about the process by which the Government obtained the delay order, however, so we will briefly address the point.

■ In general, the judicial-estoppel doctrine, where it is recognized, may prevent a party who benefits from the assertion of a certain position, from subsequently adopting a contrary position. *See generally Hal David v. Showtime/The Movie Channel*, 697 F.Supp. 752, 762–63 (S.D.N.Y.1988); *Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F.Supp. 1442, 1447–48 (S.D.N.Y.1986); 1B *Moore's* ¶ 0.405[8]; 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4477 (1981) [hereinafter *Wright & Miller*]. It is supposed to protect judicial integrity by preventing litigants from playing "fast and loose" with courts, thereby avoiding unfair results and "unseemliness." *Long Island Lighting*, 646 F.Supp. at 1447 (quoting 1B *Moore's* ¶ 0.405[8] at 240 and 18 *Wright & Miller* § 4477 at 779). The circumstances under which the doctrine could be applied are far from clear. *Universal City Studios, Inc. v. Nintendo Co.*, 578 F.Supp. 911, 920–21 & n. 3 (S.D.N.Y.1983), *aff'd*, 746 F.2d 112 (2d Cir.1984); 1B *Moore's* ¶ 0.405[8] at 243–46; 18 *Wright & Miller* § 4477 at 780–81 (1981). The key ingredient, however, is reliance. *See* 18 *Wright & Miller* § 4477 at 779–80.

In light of the *ex parte* nature of the Government's application, appellants do not, and could not, assert that they somehow relied to their detriment on the Government's initial position. *Cf. id.* § 4477 at 780–81 ("Given the great freedom permitted by modern federal procedure to assert inconsistent positions in a single action, and to amend pleadings to advance inconsistent positions for the first time during the course of suit, reliance on positions initially taken by an adversary is not well advised."). Similarly, the reliance of the court that issued the delay order, on the Government's implicit representation that the RFPA applied, was not the type that would warrant application of the doctrine. What occurred here is quite different from a situation in which a party has obtained favorable relief with an implicit but misleading representation to a court that he would not subsequently switch po-

sitions. *See Sperling v. United States,* 692 F.2d 223, 227–29 (2d Cir.1982) (Van Graafeiland, J., concurring), *cert. denied,* 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983).

We find no evidence that Denton intended to mislead or deceive the court when he applied for the delay order under the RFPA. Although the Government did not believe the Act generally applied, there was certainly room for a difference of opinion. Chemical apparently felt it applied, so it was reasonable for the Government to acquiesce in that view if it believed it could avoid litigating the issue and still protect the integrity of Froomkin's investigation. We will leave for another day the determination of whether the court would have had the power, absent the provision in the RFPA, to order Chemical not to notify Mrs. Young of the existence of the subpoena. We do observe, though, that the question is not a trivial one.[8] Since the Government's application was *ex parte,* it should have, at the very least, alerted the court to the possibility that the Act did not apply. *See Matter of Grand Jury Applications for Court–Ordered Subpoenas and Nondisclosure Orders—December 1988 Term,* 142 Misc.2d 241, 243, 536 N.Y.S.2d 939, 940 (Sup.Ct.1988) [hereinafter *Grand Jury Applications*]. Had it done so, the court would have properly determined its authority to grant the delay order. *Id.*

Despite our belief that the Government should have been more candid in its application, this is not the type of conduct the judicial estoppel doctrine seeks to deter. Moreover, in light of our conclusion that the RFPA does not apply to court-appointed commissioners, we do not see how the judicial-estoppel doctrine could affect the outcome of this case. If certain conduct falls outside a statute, the subsequent actions of an attorney cannot put it within its scope, especially where the consequence

would be to subject the United States to liability for damages. For all of these reasons, we reject the claim of judicial estoppel.

**B. *Chemical's Alleged Breach of Confidentiality***

■ Appellants' state-law claims essentially allege a breach of a confidential relationship between Mrs. Young and Chemical. At the outset, we note that Chemical's compliance with a judicially-authorized subpoena would immunize it from liability for any required disclosures. *See, e.g., Suburban Trust Co. v. Waller,* 44 Md.App. 335, 344, 408 A.2d 758, 764 (1979); *Grand Jury Applications,* 142 Misc.2d at 248, 536 N.Y. S.2d at 943; *Graney Development Corp. v. Taksen,* 92 Misc.2d 764, 767–68, 400 N.Y.S. 2d 717, 720 (Sup.Ct.), *aff'd,* 66 A.D.2d 1008, 411 N.Y.S.2d 756 (App.Div.1978). Nevertheless, appellants have also alleged that Chemical disclosed information about Mrs. Young's account to Bermuda before any subpoena had been issued. We turn our attention to that aspect of the case.

Breach of confidence is a relative newcomer to the tort family. Like the law of privilege, it is rooted in the concept that the law should recognize some relationships as confidential to encourage uninhibited discussions between the parties involved. *See Doe v. Roe,* 93 Misc.2d 201, 210, 400 N.Y.S. 2d 668, 674 (Sup.Ct.1977); Note, *Breach of Confidence: An Emerging Tort,* 82 Col. L.Rev. 1426, 1436 (1982) [hereinafter Note]. The breach-of-confidence theory may be applicable to a wide spectrum of associations but it has been asserted most frequently in the context of physician-patient and bank-customer relationships. *See* Note at 1431. At this point, New York courts have recognized it only in the context of physician-patient relationships. *See Tighe v. Ginsberg,* 146 A.D.2d 268, 270–71, 540 N.Y.S.2d 99,

---

**8.** Prior to its amendment, *see* 12 U.S.C. § 3413(i), several federal courts decided that the RFPA did not provide any authority for delayed-notification orders concerning grand-jury subpoenas and struggled to find independent grounds upon which to issue them. *See, e.g., In re Grand Jury Subpoena Duces Tecum,* 797 F.2d 676, 680 (8th Cir.), *cert. dismissed,* 479 U.S.

1013, 107 S.Ct. 661, 93 L.Ed.2d 714 (1986); *In re Grand Jury Subpoena Duces Tecum,* 575 F.Supp. 93, 94 (S.D.N.Y.1983); *see also Matter of Grand Jury Applications for Court-Ordered Subpoenas and Nondisclosure Orders—December 1988 Term,* 142 Misc.2d 241, 248, 536 N.Y.S.2d 939, 943 (Sup.Ct.1988) (searching for such authority under New York law).

100–01 (App.Div.1989); *MacDonald v. Clinger*, 84 A.D.2d 482, 483–84, 446 N.Y.S.2d 801, 804–05 (App.Div.1982); *Doe*, 93 Misc.2d at 210–11, 400 N.Y.S.2d at 674–75. As a court sitting in diversity, we must determine whether they would extend it to banker-depositor relationships as well. *See Comm'r v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967); *Magavern v. United States*, 550 F.2d 797, 801 (2d Cir.), *cert. denied*, 434 U.S. 826, 98 S.Ct. 74, 54 L.Ed.2d 84 (1977).

Since it is in its infancy, the breach-of-confidence cause of action is still experiencing growing pains. In recognizing it, "[m]ost courts have resorted to a confused tangle of legal theories, including invasion of privacy, implied term of contract, implied private cause of action in statute, and tortious breach of confidence...." Note at 1437 (footnotes omitted); *see also Doe*, 93 Misc.2d at 206, 400 N.Y.S.2d at 672 (noting conflicting analysis by New York courts in this area). We do not profess to know which source, or combination of sources, best supports or explains the contours of the doctrine, but we do not find appellants' implied-contract theory to be the appropriate starting point.

Recovery in contract, unlike recovery in tort, allows only for economic losses flowing directly from the breach. *Tighe*, 146 A.D.2d at 271, 540 N.Y.S.2d at 100; *MacDonald*, 84 A.D.2d at 486, 446 N.Y.S.2d at 804; *Restatement (Second) of Contracts* § 353 (1981). The physician-patient cases, and this case presumably, involve emotional suffering by the alleged victim of the breach, damages that would not be recoverable if the confidential relationship existed only by virtue of a contract. Moreover, recovery in contract is limited by foreseeability theories, firmly imprinted in the mind of every lawyer who studied *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng.Rep. 145 (1854), during the first year of law school.[9] It is doubtful that Mrs. Young and the Chemical representative helping her open the account considered that a breach of

some kind of implied agreement might result in the arrest and prosecution of Mrs. Young and her husband. Therefore, while contract theories may have contributed to the development of the breach-of-confidence cause of action, it owes its existence to several doctrines, including the right to privacy. *See Virelli v. Goodson–Todman Enterprises, Ltd.*, 142 A.D.2d 479, 485, 536 N.Y.S.2d 571, 575 (App.Div.1989).

We perceive that New York's courts have been rather conservative in recognizing causes of action for damages in the privacy field. *See, e.g., Arrington v. New York Times Co.*, 55 N.Y.2d 433, 439–41, 434 N.E.2d 1319, 1321–22, 449 N.Y.S.2d 941, 943–44 (1982), *cert. denied*, 459 U.S. 1146, 103 S.Ct. 787, 74 L.Ed.2d 994 (1983); *Beverley v. Choices Women's Medical Center, Inc.*, 141 A.D.2d 89, 95, 532 N.Y.S.2d 400, 405 (App.Div.), *appeal dismissed*, 73 N.Y.2d 785, 533 N.E.2d 673, 536 N.Y.S.2d 743 (1988). For example, New York's Court of Appeals has consistently held that there is no common-law right to privacy in New York. *See Arrington*, 55 N.Y.2d at 439–41, 434 N.E.2d at 1321–22, 449 N.Y.S.2d at 943–44; *Cohen v. Hallmark Cards*, 45 N.Y.2d 493, 497 n. 2, 382 N.E.2d 1145, 1146 n. 2, 410 N.Y.S.2d 282, 284 n. 2 (1977). Its legislature has restricted the right of privacy, in disputes between private parties, to cases involving unauthorized use of a person's name or likeness. *See* N.Y. Civ. Rights Law §§ 50–51 (McKinney 1976 & Supp.1989); *Arrington*, 55 N.Y.2d at 439–41, 434 N.E.2d at 1321–22, 449 N.Y.S.2d at 943–44; *Doe*, 93 Misc.2d at 212, 400 N.Y.S.2d at 676; *see also* N.Y. Pub. Off. Law § 97 (McKinney 1988) ("Civil remedies" section of Personal Privacy Protection Law, which applies to violations by government agencies, does not provide for monetary damages). Despite our earlier prediction that New York would have, by now, recognized a general right of privacy, *Galella v. Onassis*, 487 F.2d 986, 995 (2d Cir.1973), its legislature and courts have

---

**9.** For those who did not foresee the need to remember the *Hadley* case, it established that damages in contract actions are limited to those that "may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it." *Hadley*, 9 Ex. at 354, 156 Eng. Rep. at 151.

steadfastly refused to do so. *Arrington*, 55 N.Y.2d at 439–40, 434 N.E.2d at 1321–22, 449 N.Y.S.2d at 943–44; *see Doe*, 93 Misc.2d at 212 n. 8, 400 N.Y.S.2d at 676 n. 8.

Even in the context of the physician-patient relationship, New York courts have recognized that the individual right of confidentiality is limited by broader societal concerns. In *MacDonald v. Clinger*, for example, the court stated that "although public policy favors ... confidentiality [in the physician-patient context], there is a countervailing public interest to which it must yield in appropriate circumstances." 84 A.D.2d at 487, 446 N.Y.S.2d at 805. In *Doe v. Roe*, the court recognized that a physician's obligation of confidentiality "is not absolute and must give way to the general public interest." 93 Misc.2d at 214, 400 N.Y.S.2d at 677.[10] Courts in states that recognize the cause of action in banking contexts have imposed analogous limitations. In *Indiana Nat'l Bank v. Chapman*, 482 N.E.2d 474, 482 (Ind.App.1985), a case relied upon by appellants, a bank revealed information about a customer's banking history to a police officer who suspected the customer of involvement in criminal activity. The court decided that the bank had only a limited duty of confidentiality, explaining that it may not disclose customer information "unless a public duty arises," and holding that "[c]ommunication to legitimate law enforcement inquiry meets the public duty test." *Id.* In the present case, appellants allege that the bank, rather than a law enforcement official, initiated the contact. Even so, it is possible that New York courts would find that voluntary disclosure to a law enforcement agency serves the general "public interest" articulated in *MacDonald* and *Doe*. *Cf.* 12 U.S.C. § 3403(c) (voluntary tip to federal law enforcement agency cannot form basis for any liability); *see also Beverley*, 141 A.D.2d at 97, 532 N.Y.S.2d at 406 (Brown, J., concurring in part and dissenting in part) (scope of "public-interest" exceptions to statutory right to privacy "is very broad and it has been held that this exception is to be liberally construed"). *See generally* Note at 1465 (suggesting that a bank should be able to notify law enforcement authorities only when its suspicions about a customer's criminal activity are reasonable).

Like the district court, we have difficulty articulating any rationale upon which to extend the breach-of-confidence cause of action to banking relationships.[11] Mutual trust is, to be sure, a worthwhile goal in all relationships, but we do not see any reason to put discussions between banks and their depositors in the same class as those between physicians and patients. The type of disclosure encouraged in that context is hardly necessary for the bank-depositor relationship to function effectively. That is undoubtedly why courts have not recognized a banker-client testimonial privilege. *See Rosenblatt v. Northwest Airlines*, 54 F.R.D. 21, 22 (S.D.N.Y.1971); *see also King v. E.F. Hutton & Co.*, 117 F.R.D. 2, 8 (D.D.C.1987) (refusing to recognize stockbroker-client privilege).

Nevertheless, we have no doubt that most depositors believe banks will keep their banking activities confidential. At

---

**10.** This occurs, for example, when a patient clearly presents a danger to others, contracts a reportable disease, uses controlled substances or sustains a gunshot wound. *MacDonald*, 84 A.D.2d at 487, 446 N.Y.S.2d at 805; *Doe*, 93 Misc.2d at 214, 400 N.Y.S.2d at 677. The *Doe* court refused to recognize an exception to the confidentiality requirement when the only countervailing consideration is "curiosity or education of the medical profession." *Doe*, 93 Misc.2d at 214, 400 N.Y.S.2d at 677.

**11.** The district court noted that New York courts have consistently followed the Supreme Court's holding in *Miller* that customers have no standing to challenge subpoenas directed at

their bank records. *See, e.g., Doe v. Blumenkopf*, 118 A.D.2d 279, 282, 505 N.Y.S.2d 225, 227 (App.Div.1986); *People v. Doe*, 96 A.D.2d 1018, 1019, 467 N.Y.S.2d 45, 46 (App.Div.1983); *see also People v. DiRaffaele*, 55 N.Y.2d 234, 242, 433 N.E.2d 513, 516, 448 N.Y.S.2d 448, 451 (1982) (citing *Miller* with apparent approval). We do not find these decisions controlling, since the mere fact that customers do not have a fourth amendment interest in these records does not mean that they could not have any privacy interest in a civil context. *Compare Indiana Nat'l Bank*, 482 N.E.2d at 478, *with id.* at 480–82, 484.

the very least, banks have fostered that impression. The American Bankers Association counsels its members that customer account information should generally be kept confidential, *see Milohnich v. First Nat'l Bank of Miami,* 224 So.2d 759, 761 (Fla.App.1969) (citing 1 *Paton's Digest* 619 (Opinion 19–1) (1940)), and acknowledges that most customers assume that banking transactions are confidential, *see Hearings on H.R. 8133 Before the Subcomm. on Financial Institutions' Supervision, Regulation and Insurance,* 95th Cong., 2d Sess. (1977) (statement of Morris F. Miller on behalf of the American Bankers Association) (H. Rep. at 1586). *See also Restatement (Second) of Agency* § 395 (stating that agent should keep information obtained from principal confidential). Banks have cited the existence of a confidential relationship in arguments contesting subpoenas. *See, e.g., In re Sandin,* 134 Misc.2d 968, 969, 513 N.Y.S.2d 645, 646 (Sur.Ct.1987). In this case, Chemical refused to release Mrs. Young's records without a court-ordered subpoena. We believe that any customer who has ever tried to get his or her own account balance over the phone from an obdurate bank employee would be quite surprised to learn that the same information could be freely disclosed to a law enforcement agency.

Therefore, we are not surprised that courts in several jurisdictions have applied the breach-of-confidence doctrine in banking contexts. *See Barnett Bank of West Florida v. Hooper,* 498 So.2d 923, 925 (Fla. 1986); *Milohnich,* 224 So.2d at 759; *Suburban Trust Co. v. Waller,* 44 Md.App. 335, 344, 408 A.2d 758, 764 (1979); *Peterson v. Idaho First Nat'l Bank,* 83 Idaho 578, 588, 367 P.2d 284, 290 (1961); *Indiana Nat'l Bank,* 482 N.E.2d at 482; *Tournier v. National Provincial and Union Bank of England,* [1923] 1 K.B. 461, 475, 480, 484; Annotation, *Bank's Duty to Customer not to Disclose Information as to His Financial Condition,* 92 A.L.R.2d 900 (1963).

Indeed, at least one New York court demonstrated a willingness to extend the cause of action to this area. In *Graney Development Corp. v. Taksen,* 92 Misc.2d 764, 767–68, 400 N.Y.S.2d 717, 720 (Sup.Ct.), *aff'd,* 66 A.D.2d 1008, 411 N.Y.S.2d 756 (App.Div.1978), the court appeared to accept the argument that a confidential relationship existed between banks and their depositors but refused to recognize it when mere borrowers were involved. In affirming the *Graney* decision, the appellate court adopted the reasoning of the lower court and never indicated any disagreement with the assumption that the relationship could exist in other banking contexts. Moreover, the court in *Grand Jury Applications,* 142 Misc.2d at 248, 536 N.Y.S.2d at 943, noted that bank customers may enjoy common-law-privacy protection of their account records. Therefore, if a New York court applied the doctrine to banking relationships, it would not be breaking any significant legal ground.[12]

Although we might be inclined to hold that the breach-of-confidence cause of action should not be extended to banking relationships, we recognize that such a decision could have serious repercussions for the New York banking community. We are particularly concerned that if we found no duty requiring New York banks to keep account information confidential, some customers might be inclined to transfer their business from institutions in this jurisdiction, home to one of the world's financial capitals, to banks in "confidential" jurisdictions. We feel that a New York court would be in the best position to assess that possible impact on the local banking industry.

Considering the still-developing nature of the breach-of-confidence doctrine, the lack of New York precedent and the local policy issues involved, our prediction of what a state court would do with this question

12. We, along with at least one other court in this circuit, have alluded to a bank's duty in New York to keep customer information confidential, citing *Graney. See Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank,* 731 F.2d 112, 123 (2d Cir.1984); *Sharma v. Skaarup Ship Management Corp.,* 699 F.Supp. 440, 449 (S.D.N.Y.1988). Other circuits have suggested that banks have a general duty to keep customer information confidential. *See, e.g., Peoples Bank of Virgin Islands v. Figueroa,* 559 F.2d 914, 917 (3d Cir.1977).

would be little more than a guess. If we turned out to be wrong, subsequent state-court action, or legislation, "overruling" our decision, might not occur for several years—possibly too late to reverse any resultant damage to the banking community. In a related context, the Supreme Court has cautioned that federal courts should avoid providing "a tentative answer which may be displaced tomorrow by a state adjudication." *Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 500, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941). That principle is even more compelling in a case such as this, when a federal court's decision on a matter of state law might possibly inflict wide-ranging damage on the local community.

Alluding to these considerations, appellants have asked us to exercise our power to abstain and to dismiss the state-law claims without prejudice, so they may be pursued in state court. *See* Brief for Appellants (Young v. Chemical) at 11–12. Chemical has not expressed any views on the abstention issue. In *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 820, 96 S.Ct. 1236, 1247, 47 L.Ed.2d 483 (1976), the Court noted that federal courts have a "heavy obligation to exercise jurisdiction" in cases before them. *See also id.* at 817, 96 S.Ct. at 1246 (noting "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them"); *id.* at 819, 96 S.Ct. at 1247 ("[o]nly the clearest of justifications will warrant dismissal"). It explained:

> Abstention from the exercise of federal jurisdiction is the exception, not the rule. "The doctrine of abstention ... is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest."

*Id.* at 813, 96 S.Ct. at 1244 (quoting *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959)). In deciding whether to abstain, courts should conduct "a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 16, 103 S.Ct. 927, 937, 74 L.Ed.2d 765 (1983); *see Law Enforcement Insurance Co. v. Corcoran*, 807 F.2d 38, 40 (2d Cir.1986), *cert. denied*, 481 U.S. 1017, 107 S.Ct. 1896, 95 L.Ed.2d 503 (1987).

Our decision in this case is also guided by the principle that federal courts should leave for state court determination "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." *Colorado River*, 424 U.S. at 814, 96 S.Ct. at 1244. We believe this is such an issue, which we feel would best be determined in a setting lending itself to prompt review by New York's appellate courts. Moreover, the parties' interests in our retaining jurisdiction are not particularly compelling. The case has progressed no further in the district court than the filing of a complaint and motions to dismiss and appellants, who initiated these actions, have expressly asked us to consider abstaining. Had this not been the case, or if Chemical had raised any objection to the possibility of our abstaining, we might have been more reluctant to send the parties to state court. *See Colorado River*, 424 U.S. at 820, 96 S.Ct. at 1247. In light of our affirmance of the dismissal of the federal causes of action and the procedural posture of the case, however, we believe justice would best be served by providing a New York court the opportunity to decide the state-law question, the only issue remaining. *See Moses H. Cone Memorial Hospital*, 460 U.S. at 28, 103 S.Ct. at 943.

The abstention issue was also not raised before the district court and we have considered it only because of the potentially serious repercussions that might accompany an affirmance. *Id.* at 29, 103 S.Ct. at 943. We are confident that if the district court had been given the opportunity to

consider the matter, it would have reached the same conclusion that we have, so we see no reason to remand for any further consideration. Accordingly, we modify the judgment of the district court to the extent it dismissed the state-law claims against Chemical so that they are now dismissed without prejudice, with leave to refile in New York state court.

## CONCLUSION

The judgment of the district court dismissing the action against the Government is affirmed. The judgment of dismissal in the case against Chemical is modified as described above.