896 F.Supp. 1415 (1995)
Luis VELASQUEZ-CAMPUZANO and Juana Chavez-Lujan
v.
MARFA NATIONAL BANK.
No. P-94-CA-011-F.
United States District Court, W.D. Texas, Pecos Division.
June 9, 1995.
*1416 *1417 Mike Barclay, Alpine, TX, John G. Minniece, III, Marfa, TX, for plaintiffs.
John B. Hemphill, San Angelo, TX, for defendant.

MEMORANDUM OPINION AND ORDER
FURGESON, District Judge.
Before the court are the Defendant's Motion for Summary Judgment, filed June 9, 1994, and Plaintiffs' Joint Cross Motion for Summary Judgment, filed June 15, 1994. For the following reasons, Defendant's Motion *1418 is granted and Plaintiffs' Motion is denied.

I. PROCEDURAL HISTORY
This cause was removed to this court from the 83rd Judicial District Court in Presidio County, Texas, on March 3, 1994 on the basis of federal question jurisdiction. Plaintiff Luis Velasquez-Campuzano ("Plaintiff Velasquez") and Plaintiff Juana Chavez-Lujan ("Plaintiff Chavez") filed their Amended Complaint on May 20, 1994, alleging (1) violation of the Federal Right to Financial Privacy Act ("RFPA"), 12 U.S.C. §§ 3401-3422; (2) violation of the Texas Banking Code of 1943; (3) breach of the constitutional right to privacy; (4) breach of the common law; (5) breach of the implied condition of confidentiality; and (6) defamation.
After filing a timely Answer, Defendant Marfa National Bank ("MNB" or "the Bank") moved for summary judgment on June 9, 1994. On June 15, 1994, the Plaintiffs responded with a Cross Motion for Summary Judgment.[1] This matter was heard at oral argument on July 11, 1994, and is now ripe for consideration.

II. BACKGROUND
The relevant facts are not in dispute. Plaintiffs, a husband and wife, are citizens of the Republic of Mexico, and live in Ojinaga in the State of Chihuahua. At the time in question, Plaintiffs were customers of MNB, having placed certain funds in a checking account and certificates of deposit.
This suit arises from a single transaction between the Bank and the Plaintiffs, which occurred on January 11, 1991. On that date, the Plaintiffs visited the offices of MNB in Marfa, Texas. In order to take advantage of relatively high rates of interest in Mexico, the Plaintiffs sought to withdraw funds from their account at MNB and place them in the National Bank of Mexico in Ojinaga. Once greeted by Glenn Garcia, a MNB employee, the Plaintiffs asked to redeem two certificates of deposit, pay off a loan, and make a cash withdrawal. The completion of these transactions meant that the Plaintiffs stood to leave MNB's offices with $18,500 in U.S. currency.
In compliance with federal law regarding cash withdrawals in excess of $10,000, Garcia asked the Plaintiffs for identification so that he could complete the required Currency Transaction Report.[2] Immediately after making this request, Garcia heard the Plaintiffs discuss alternative ways to arrange the transaction.[3] Garcia left the room for a few moments, but then returned to again ask the Plaintiffs for identification. The Plaintiffs told Garcia that they now wished to leave the bank with only $9000 in cash and asked why identification was needed. The Plaintiffs consequently revised their transaction such that they left MNB with $9000 in cash and a $50,000 cashiers check.
After leaving the Bank's offices in Marfa, the Plaintiffs traveled to the border town of Presidio, Texas. There, they exchanged the $50,000 cashiers check for four smaller checks. Three of these smaller checks were cashed on the same day, in amounts less than $10,000. The fourth smaller check was cashed shortly thereafter. Plaintiff Velasquez admitted in his deposition that the $50,000 was changed to smaller checks so that he could take less than $10,000 in cash across the Presidio border bridge into Mexico. Vel. Depo. at 40.
Both the transaction of January 11 and the later transactions which occurred in Presidio came to the attention of MNB's compliance officer, Clementine Bales. Bales suspected *1419 that the Plaintiffs had committed a structuring offense, and submitted a Criminal Referral Form to the appropriate federal offices.
In connection with the Bank's referral, Plaintiffs were indicted and tried on charges relating to illegal structuring of currency withdrawals. See United States v. Luis Velasquez-Campuzano, No. P-92-CR-036(01) (W.D.Tex.1992); United States v. Juana Chavez-Lujan, No. P-92-CR-36(2) (W.D.Tex.1992). The jury found Plaintiff Velasquez not guilty of one count of the indictment. However, he pleaded guilty to the remaining counts for (1) causing or attempting to cause a financial institution to fail to file a currency transaction report, 31 U.S.C. § 5324(a)(1); (2) illegal structuring of a transaction, 31 U.S.C. § 5324(a)(3); and (3) false statements, 18 U.S.C. § 1001.[4] The jury did not return a verdict against Plaintiff Chavez. She did not enter a plea, nor was she retried. The charges against her were later dismissed.

III. STANDARD FOR SUMMARY JUDGMENT
Summary judgment "shall be rendered forthwith" where the pleadings and evidence on file show that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). Rule 56 mandates the entry of summary judgment where the requirements of the rule are met. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273-74 (1986). The threshold inquiry in analyzing a motion for summary judgment is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 213 (1986). The initial burden is on the party moving for summary judgment to demonstrate that there are no genuine factual issues. Celotex, 477 U.S. at 323, 106 S.Ct. at 2552, 91 L.Ed.2d at 273-74. However, the movant need not negate the elements of the nonmovant's case. It is sufficient that the movant point to an absence of evidence to support the nonmovant's case. If the movant fails to carry this opening burden, summary judgment is not appropriate, regardless of the nonmovant's response. Id.
If, however, the movant meets the initial required showing, the burden then shifts to the nonmovant to "come forward with evidence establishing each of the challenged elements of its case for which the nonmovant will bear the burden of proof at trial." Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir.1992) (citing Celotex, 477 U.S. at 322, 106 S.Ct. at 2552, 91 L.Ed.2d at 273). The nonmovant may satisfy this burden only through competent evidence, such as depositions or affidavits. Topalian, 954 F.2d at 1131. Mere conclusory allegations will neither defeat nor support a motion for summary judgment. Id.
Factual controversies must be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994). It is not appropriate for a court to assume that the nonmoving party could or would prove necessary facts, in the absence of actual proof of those facts. Id. If the nonmovant fails to meet this burden of proof, and there is no genuine controversy of fact, summary judgment must be rendered.
Here, both parties have moved for summary judgment. This circumstance alone does not render a trial unnecessary, nor does it mean that no fact issues exist. 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2720 (2d. ed. 1983 & Supp. 1994). Rather, the Motion of each party must be considered independently. Id.
It should be noted here that while both parties have moved for summary judgment, only Defendant has provided this court with competent summary judgment evidence. Specifically, Defendant has provided this court with two sworn affidavits and excerpts *1420 from the depositions of both Plaintiffs. Since there is no sworn contradictory evidence, this court takes the facts to be noncontroverted and draws them from these documents. Plaintiffs cannot rely on the pleadings to show a fact issue, but must argue both Motions, if at all, on the basis of Defendant's submission. See FED.R.CIV.P. 56(e); Isquith v. Middle South Utilities, Inc., 847 F.2d 186, 199 (5th Cir.) (noting that nonmovant filing no countervailing evidentiary materials may still utilize evidence supplied by movant to defeat summary judgment), cert. denied, 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988); John Hancock Mutual Life Ins. Co. v. Johnson, 736 F.2d 315, 316 (5th Cir.1984) (holding that nonmovant filing no countervailing evidentiary materials may not rely on pleadings to establish fact issue).

IV. DISCUSSION

A. Claims under federal law

1. Liability under the Right to Financial Privacy Act
Plaintiffs concede that the RFPA permitted the Bank to disclose a limited amount of account information to government agencies in the face of suspected criminal activity. Nonetheless, Plaintiffs argue that the Bank is liable under the RFPA for revealing too much detail regarding the suspected criminal transaction, including "an ethnic slur and comments on the deceitful nature of the Plaintiffs."
At this juncture, it is important to consider the overall purpose and origin of the RFPA. In United States v. Miller, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), the Supreme Court held that there was no constitutional right to privacy in banking records. In direct response to this decision, Congress chose to "provide protection of individual rights beyond that afforded in the Constitution," and enacted the RFPA. H.R.Rep. No. 1383, 95th Cong., 2d Sess. 33-34, reprinted in 1978 U.S.C.C.A.N. 9273, 9305-9306. But it was clear from the outset that the newly created statutory right to privacy in banking records would not be absolute. Rather, the RFPA "seeks to strike a balance between customers' right of privacy and the need of law enforcement agencies to obtain financial records pursuant to legitimate investigations." Id. Consequently, there are a number of exceptions to the requirements of the RFPA. Here, the issues for the court are whether MNB's disclosure falls within these exceptions, and if so, what effect this carries.

a. Compliance with mandatory federal statutes and laws.
The RFPA does not apply where federal laws compels disclosure. The Act provides in part:
Disclosure pursuant to Federal statute or rule promulgated thereunder
Nothing in this chapter shall authorize the withholding of financial records or information required to be reported in accordance with any Federal statute or rule promulgated thereunder.
12 U.S.C. § 3413(d). See also 12 U.S.C. § 3402 (providing that terms of Act apply "[e]xcept as provided by section 3403(c) or (d), 3413, or 3414.").
There can be no question that, on these facts, the disclosure made by the Bank was required by law. It is undisputed that MNB is a nationally chartered bank. As such, it is subject to the rules and regulations of the Office of the Comptroller of the Currency ("OCC"). 12 U.S.C. § 27(b)(2). OCC requires banks to file Criminal Referral Forms in the face of "known or suspected crimes involving national banks." 12 C.F.R. § 21.11(a).
The conduct exhibited by Plaintiffs on January 11, 1991 was sufficient to trigger the reporting requirement. The Bank's employees had good reason to suspect that the Bank was being used to facilitate the crime of structuring a transaction to evade a reporting requirement, 31 U.S.C. § 5324(a)(3).[5] *1421 The reluctance of the Plaintiffs to provide identification, the restructuring of the initial transaction, and the later transactions in Presidio all point to violation of this statute. Had the bank failed to file a referral, it would have been subject to civil money penalties. 12 C.F.R. § 21.11(i).
A nationally chartered bank, faced with suspected criminal behavior, does not satisfy its obligations under federal law by merely filing a referral. Rather, federal law also dictates the scope and nature of the referral. OCC rules provide that a bank which knows of or suspects criminal activity "shall file OCC Criminal Referral Form (CC-8010-08 or CC-8010-09) in accordance with the instructions on the form." 12 C.F.R. § 21.11(b) (emphasis added). Thus, a nationally chartered bank with knowledge or suspicions of criminal activity must (1) file a Criminal Referral Form; and (2) answer the questions on the Form responsively.
Here, MNB met both requirements. The Referral Form filed by the Bank is attached as an Appendix to this opinion. [Editor's Note: Appendix not included for purposes of publication] The answers MNB provided to the questions posed in the Referral Form are clearly responsive. Plaintiffs' argument that MNB improperly provided information in "great detail" does not float. The OCC, via the Referral Form, requires that a referring bank:
Give a chronological and complete account of the suspected violation (use continuation sheets if necessary.)
 Relate key events to documents and attach copies of those documents.
 Explain who benefited, financially or otherwise, from the transaction, how much and how.
 Furnish any explanation of the transaction provided by the suspect and indicate to whom and when it was given.
 Furnish any explanation of the transaction provided by any other person.
 Furnish any evidence of cover-up or evidence of an attempt to deceive federal or state examiners or others.
 Indicate where the suspected violation took place (e.g. main office, branch, other).
 Suggest any further investigation that might assist law enforcement in fully examining the potential violation.
This language is followed by an explanation that "[t]his section of the referral is critical. It should be as detailed as circumstances permit." (emphasis added). Plaintiff thus cannot be heard to complain that MNB improperly furnished detailed information, since detailed information was exactly what the law required.
As MNB's disclosure was required by law and fits within the section 3413(d) exception, the provisions of the RFPA do not apply. Therefore, the RFPA does not afford Plaintiffs a cause of action.

b. Voluntary notification of government agency of suspected crime.
A separate exception to the RFPA is found in section 3403(c), which applies where a bank voluntarily notifies a government agency of the existence of financial records which point to criminal activity.[6] Banks acting *1422 within this exception are immune from all civil liability to customers resulting from the disclosure. 12 U.S.C. § 3403(c).
Plaintiffs apparently argue that section 3403(c) is the exclusive exception that operates to shield a bank from civil liability for disclosure. Thus, the argument goes, if MNB's referral exceeds the scope of disclosure permissible under section 3403(c), the Bank is amenable to suit under the RFPA and any other applicable cause of action. This court does not agree with this reasoning. As noted above, the RFPA does not apply where disclosure is mandated by federal law. 12 U.S.C. § 3413(d).[7] On this basis alone, MNB is not liable under the RFPA.
What remains to be seen is whether the RFPA provides MNB with a shield to liability for other causes of action. The importance of this question is quickly apparent. Voluntary disclosure within section 3403(c) preempts all civil liability to customers stemming from the disclosure. But no similar "safe harbor" provision is found in section 3413(d), which relates to disclosure mandated by federal law.
Defendants and various amici argue that the disclosure in this case meets the requirements of section 3403(c) so as to bar all of Plaintiffs' causes of action. It is important to recognize that the nature of information that may be disclosed under section 3413(c) is limited. Banks are allowed to notify the government that certain incriminating records exist. In providing such tips, banks may furnish only the name of the individual or entity and account involved, and the nature of the criminal activity.
The parties debate whether the information contained within the four corners of the MNB's Referral Form exceeds these limitations. What the parties, or at least the Plaintiffs, ignore is that MNB went beyond letting the government merely know of the existence of incriminating records. As an attachment to the Referral Form, MNB employees submitted actual records.[8] Section 3403 does not apply to the release of records. Frazin, 780 F.2d at 1465 n. 1; Whitty, 688 F.Supp. at 59. The cases cited by defendants are distinguishable on this basis. The referring banks either provided only information *1423 that fell within section 3403(c), Waye v. Commonwealth Bank, 846 F.Supp. 321 (M.D.Pa.1994), or provided both information protected by section 3403(c) and documents pursuant to subpoena. Waye v. First Citizen's National Bank, 846 F.Supp. 310 (M.D.Pa.), aff'd, 31 F.3d 1175 (3d Cir.1994).
Nonetheless, federal law requires the release of actual records via the Criminal Referral Form. We are thus left with the unhappy situation where financial institutions are vulnerable to suit for other non-RFPA causes of action when those institutions, in compliance with the criminal referral requirements of the OCC, disclose actual financial records. As pointed out by the United States as amici, after the occurrence of the transaction at issue here, Congress saw fit to remedy this situation by explicitly providing blanket immunity from civil liability for a bank's disclosure of information required by Federal law. See Annunzio-Wylie Anti-Money Laundering Act, Pub.L. 102-550, 106 Stat. 4059 (Oct. 28, 1992) (codified at 31 U.S.C. § 5318). This statute provides in part:
Any financial institution that makes a disclosure of any possible violation of law or regulation or a disclosure pursuant to this subsection or any other authority ... shall not be liable to any person under any law or regulation of the United States or any constitution, law or regulation of any State or political subdivision thereof, for such disclosure or for any failure to notify the person involved in the transaction or any other person of such disclosure.
31 U.S.C. § 5318(g)(3) (emphasis added). The United States takes no position as to the applicability of this statute to the case at bar. The parties have not briefed this issue, but it is fairly raised by the present posture and facts of this case.
Section 5318(g)(3) is relevant here, if at all, via retroactive application. The Supreme Court recently clarified the analysis by which courts are to determine whether such application is appropriate in Landgraf v. U.S.I. Film Products, 511 U.S. ___, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). The first step is to determine whether Congress has expressly resolved the retroactivity issue. Id. at ___-___, 114 S.Ct. at 1505, 128 L.Ed.2d at 261-262. Here, the statute itself provides no answer.
There is however, an interesting piece of legislative history found in the Congressional Record. In the term immediately following that in which the Act was passed, Congressman Stephen Neal remarked:
As this legislation was added during a House-Senate conference there was no legislative history. After adjournment the Honorable Frank Annunzio, who was both the chairman of the Financial Institutions Subcommittee and author of the bill was asked and responded to, a question by a major U.S. bank about the applicability of the new law to help clarify the meaning of this law....
139 CONG.REC. E57-02 (1993). With that, Congressman Neal asked that two letters be printed in the Record. The first letter is from an attorney for Chemical Bank and is addressed to Congressman Annunzio. The letter conveys the bank's "understanding that the `safe harbor' provision of [the Act] applies not only to disclosures made after the date of its enactment, but also to those disclosures made ... prior to enactment of the Act," and asks for Congressman Annunzio's comment on the subject. Id. The second letter is Congressman Annunzio's response. He states that it was his intent "as the author of the provision that it would apply to any such disclosure, regardless of whether the disclosure was made prior or subsequent to the date of the enactment of the Act." Id.
This court is thus presented with a potentially easy answer to the question of congressional intent regarding retroactive application of the Act. However, the Court in Landgraf cautioned against the use of such "frankly partisan statements" which "cannot plausibly be read as reflecting any general agreement." ___ U.S. at ___, 114 S.Ct. at 1495, 128 L.Ed.2d at 250. The Court also saw fit to quote the observation of veteran Senator Danforth that "a court would be well advised to take with a large grain of salt floor debate and statements placed in the CONGRESSIONAL RECORD which purport to create an interpretation for the legislation that is before us." Id. at ___, 114 S.Ct. at 1495, *1424 128 L.Ed.2d at 251 (citing 137 CONG.REC. S15325 (Oct. 29, 1991)).
As there is no overall congressional expression regarding retroactivity of the Act, this court turns to the "default" rules recognized in Landgraf. Landgraf is an attempt to reconcile two competing maxims of retroactivity; (1) that a court must apply the law in effect at the time it renders its decision and (2) that statutes are presumed not to apply retroactively. The court held that whether one maxim or the other was to be applied depended on the nature of the statute presented. For statutes, or provisions of statutes, which affect the substantive rights of the parties, application of the later maxim is appropriate. Conversely, for statutes in which only procedural rights are at issue, the former maxim should be followed. See also Hartford Cas. Ins. Co. v. F.D.I.C., 21 F.3d 696, 700-01 (5th Cir.1994) (interpreting Landgraf).
The "safe harbor" provision at issue here would clearly change the substantive rights of the parties were it to be applied retroactively. It cannot be fairly categorized within the alternative class of cases which enjoy retroactive application under Landgraf. This court therefore determines that the "safe harbor" provisions of the Annunzio-Wylie Anti-Money Laundering Act should not be given retroactive effect. Thus, while MNB's disclosure creates no liability under the RFPA, neither does it preempt liability under state law.

2. Liability for breach of the constitutional right to privacy
Plaintiffs assert that they are entitled damages for MNB's violation of their constitutional right to privacy in banking records. Plaintiffs cite no authority in support of this claim. This court is left to assume that Plaintiffs are asserting a Bivens cause of action. See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Without concluding that other requirements of a Bivens action are met on these facts, this court rejects this claim on the basis that no constitutional violation has occurred. As noted earlier, the Supreme Court in Miller has declined to recognize a constitutional right to privacy in banking records. Miller, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71. Some courts have suggested that Miller does not preclude a civil action for damages for the improper release of financial information based on violation of a constitutional right to privacy. See Young v. Department of Justice, 882 F.2d 633, 642 n. 11 (2nd Cir.1989), cert. denied, 493 U.S. 1072, 110 S.Ct. 1116, 107 L.Ed.2d 1023 (1990); Hunter v. Securities Exchange Commission, 879 F.Supp. 494 (E.D.Pa.1995). These cases, however, do not suggest that such an action may be maintained, where as here, a legitimate government interest  namely prevention of money laundering  counsels against finding a privacy right. Cf. Fadjo v. Coon, 633 F.2d 1172, 1175 (5th Cir. Unit B 1981) (allowing § 1983 cause of action for alleged violation of constitutional right to privacy where "no legitimate state purpose existed sufficient to outweigh the invasion into [the claimant's] privacy."). This approach is consistent with other arenas in which constitutional rights conflict with the need for legitimate enforcement of our nation's laws. The right to free speech, for example, does not prohibit the prosecution of insider trading. Thus, Plaintiffs have asserted no violation of a constitutional right sufficient to support a Bivens claim.

B. State law claims
Plaintiffs' remaining grounds of recovery arise from state law. Of course, these claims are properly before this court pursuant to its power to hear supplemental questions of state law. However, the exercise of this power is discretionary. The decision must be based on "considerations of judicial economy, convenience, and fairness to the litigants." United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218, 228 (1966); 28 U.S.C. § 1367(a). Given that this court has decided the questions of federal law raised here, it is at least arguable that this court should dismiss the remaining state law claims.
This court chooses to exercise its discretion to hear the remaining state law claims. This cause was originally filed in *1425 state court sixteen months ago. The Motions for Summary Judgment now before this court have been pending for nearly one year. Concerns of fairness and convenience counsel in favor of this court ready determination of the remaining claims. Further, while comity weighs heavily in this court's determination, there is no reason to believe that Texas courts would resolve the remaining state issues in a manner different than this court.

1. Violation of Article 342-705 of the Texas Banking Code
Plaintiffs assert that MNB's disclosure, via the Criminal Referral Form, violates the Texas Banking Code. However, the Texas Banking Code, like the RFPA, expressly does not apply where disclosure is compelled by law. The Banking Code does not pertain to:
disclosure or production of ... records of accounts and other financial institution records if the ... disclosure is made under or in substantial compliance with applicable federal law, including regulations.
TEX.REV.CIV.STAT.ANN. ART 342-705 § 5(a) (Vernon Supp.1995).
For reasons previously discussed, MNB's disclosure, in its entirety, was mandated by federal law. Therefore, Plaintiffs have no cause of action under Article 342-705 of the Texas Banking Code.

2. Breach of the common law and breach of an implied condition of confidentiality
Texas law is somewhat unsettled as it applies to the claims Plaintiffs raise here.[9] Nonetheless, this court's reading of Texas precedent cautions against recognition of the remedy Plaintiffs seek. Plaintiffs cite no law to support the existence of either of these causes of action. This court finds no authority in Texas law to support liability under these theories.
Common law supports a cause of action for a bank's unauthorized disclosure of financial information only in limited circumstances. Courts have allowed such claims on theories of (1) implied duty of confidentiality stemming from contractual relations with the bank; (2) fiduciary duty; and (3) a right of privacy. Robert E. Huhs, To Disclose or Not to Disclose Customer Records, 108 BANKING L.J. 30 (1991); see also Edward L. Raymond, Annotation, Bank's Liability, Under State Law, for Disclosing Financial Information Concerning Depositor or Customer, *1426 81 A.L.R.4th 377 (1990 & Supp.1994). Each theory must be addressed in turn.
This court finds no Texas case recognizing an implied duty of confidentiality owed by a bank to its customer. Moreover, even in the first known decision recognizing such a relationship, coming to us from the England, the court observed that a bank's disclosure does not give rise to liability to the extent that it is mandated by law. Tournier v. National Provincal & Union Bank of England, 1 K.B. 461, 473 (1923) (noting four circumstances in which disclosure is proper). Even while disagreeing over the propriety of disclosure in other circumstances, courts in this country have followed this premise. See, e.g., Indiana National Bank v. Chapman, 482 N.E.2d 474 (Ind.Ct.App.1985) (observing that voluntary response by bank to legitimate law enforcement inquiry does not breach confidentiality); Suburban Trust Co. v. Waller, 44 Md.App. 335, 408 A.2d 758 (1979) (recognizing that disclosure where required by law does not violate duty of confidentiality). There is every reason to assume that if Texas recognized an implied duty of confidentiality, it would do so with the same strictures.
A breach of fiduciary duty theory of relief is similarly unpromising. In Texas, the relationship between a bank and its customers is generally not fiduciary in nature. Berry v. First National Bank of Olney, 894 S.W.2d 558, 560 (Tex.App.  Fort Worth 1995, n.w.h.). Further, the existence of a fiduciary relationship is generally a fact issue. Id. Here, Plaintiffs have pointed to no facts which suggest a fiduciary relationship.
Finally, while Texas has recognized a claim for breach of the common law right of privacy, Billings v. Atkinson, 489 S.W.2d 858 (Tex.1973), claimants seeking to extend this right to improper disclosure of banking or credit records have fared poorly. See Cullum v. Gov't Employees Financial Corp., 517 S.W.2d 317, 318 (Tex.Civ.App.  Beaumont 1974, writ ref'd n.r.e.) (finding no cause of action where lender's financial institution sent letter to lender's employer seeking assistance in collection); Palmatier v. Beck, 636 S.W.2d 575, 577-78 (Tex.Ct.App.  Fort Worth 1982, no writ) (holding that no claim for breach of right privacy existed where bank released account balance information to landlord of depositor's son). Both Cullum and Palmatier suggest an important limitation to an actionable privacy right in Texas  true statements of a customer's or creditor's account made without hype are not actionable. Distinguishing earlier recognition of a privacy right in Billings, the courts in both Cullum and Palmatier noted that the disclosures before them were not "inflammatory, humiliating, or misleading statements." Cullum, 517 S.W.2d at 317; Palmatier, 636 S.W.2d at 577-78 (citing Cullum). This same limiting factor defeats Plaintiffs' claims here. MNB's disclosure amounts to no more than a rather pedestrian recitation of facts which correctly suggested suspicious conduct on the part of the Plaintiffs.
Plaintiffs' generalized assertions of common law liability fail. Regardless of the label of the theory  as breach of confidentiality, breach of fiduciary duty, or breach of the right of privacy  this court cannot fathom that any Texas court would sanction a common law cause of action on the facts present here. MNB's disclosure was required by law, made in good faith, and served a legitimate law enforcement purpose.

3. Defamation
Finally, Plaintiffs allege that MNB's filing of the Criminal Referral Form is defamatory. However, in order to be actionable, a defamatory statement must be false. Cain v. Hearst Corp., 878 S.W.2d 577, 580 (Tex.1994). As Plaintiffs bear the burden of proving the elements of defamation at trial, Hardwick v. Houston Lighting and Power Co., 881 S.W.2d 195, 198 (Tex.App.  Corpus Christi 1994, writ denied), they may not simply rest on the pleadings, but must come forward with facts that show that the Criminal Referral Form contains false statements.
Plaintiffs have not carried this burden. To the contrary, the evidence before this court suggests that the Criminal Referral Form contained only true statements. This court also observes that Plaintiff Velasquez pleaded guilty to illegal structuring, along with other offenses, and may well be collaterally *1427 estopped from relitigating the facts which underlie his conviction. In any event, Plaintiffs' claim for defamation fails.

V. Conclusion
No cause of action lies under the RFPA where a bank discloses information as required by federal law. But neither does the RFPA preempt state causes of action. Nor do the safe harbor provisions of the Annunzio-Wylie Money Laundering Act apply retroactively so as to defeat Plaintiffs' state law claims.
This court does not believe, however, that this Opinion should sound an alarm bell for financial institutions which provide information or documents to government agencies as required by law. While state causes of actions for disclosures prior to 1992 are not preempted by federal law, it is unlikely that the common law of Texas, or indeed any state, could be interpreted so as to hold a bank liable for disclosing to government agencies no more than it is required to do by law. This court is unaware of any such decision in any jurisdiction, whether based on common law or state statute or regulation.
Accordingly, it is ORDERED that Defendant's Motion for Summary Judgment is GRANTED.
It is further ORDERED that the Plaintiffs' Cross Motion for Summary Judgment is DENIED.
NOTES
[1] This court has also received and considered amicus briefs from the United States, the Independent Bankers Association of Texas, the Texas Bankers Association and the American Bankers Association.
[2] Federal law requires that banks file a currency transaction report with the Treasury Department for cash transactions in excess of $10,000. 31 U.S.C. § 5313; 31 C.F.R. § 103.22(a)(1). Further, a bank may not complete such a transaction without verifying the identification of the customer. 31 C.F.R. § 103.28(a)(1).
[3] By Defendant's concession, it is disputed whether Garcia overheard Velasquez make a remark to Lujan about the currency transaction report. Def.Mtn. for Summ.J. at 2. However, this dispute is ultimately irrelevant to the determination of the Motions before this court.
[4] The court (Bunton, J.) initially sentenced Velasquez-Campuzano to three years probation and a $5000 fine, but on April 22, 1994, the court discharged the balance of his probation term.
[5] In 1991, the law was that to convict under this offense, the government need only show that (1) the defendant knew of the bank's obligation to report transactions in excess of $10,000 and (2) acted with the purpose of defeating that requirement rather than for an innocent purpose. United States v. Beaumont, 972 F.2d 91 (5th Cir. 1992). It should be noted in passing that the law has since changed. See Ratzlaf v. United States, ___ U.S. ___, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) (holding that to prove illegal structuring, government must make additional showing that accused knew his conduct was illegal).

Of course, not all criminal activity is subject to reporting under OCC rules. See 12 C.F.R. § 21.11(b). In this case however, the transaction at issue fell within the Bank's obligation to report "[a]ny known or suspected criminal violation ... of any section of the United States Code ... involving a financial transaction conducted through the bank and involving ... $1000 or more in bank funds or other assets, where the bank believes, in good faith, that ... [it] was used to facilitate a criminal transaction, and the bank has a substantial basis for identifying a possible suspect or group of suspects." 12 C.F.R. § 21.11(b)(4). Persons who cross a United States border with an amount of cash that exceeds $10,000 must notify the government that they are doing so. 31 U.S.C. § 5316.
[6] Section 3403(c) of the RFPA states:

Notification to Government authority of existence of relevant information in records
Nothing in the chapter shall preclude any financial institution ... from notifying a Government authority that such institution ... has information which may be relevant to a possible violation of any statute or regulation. Such information may include only the name or other identifying information concerning any individual, corporation, or account involved in and the nature of any suspected criminal activity. Such information may be disclosed notwithstanding any constitution, law, or regulation of any state or political subdivision thereof to the contrary. Any financial institution ... making a disclosure of information pursuant to this subsection shall not be liable to the customer under any law or regulation of the United States or any constitution, law, or regulation of any state or political subdivision thereof, for such disclosure or for any failure to notify the customer or such disclosure.
[7] Plaintiffs cite numerous cases as authority for the proposition that the filing of a Criminal Referral Form "is per se violation of the RFPA beyond the scope of the information allowed." Plf.Mem. in Support at 3.

This court takes a different reading of this authority. First, these cases all involve voluntary disclosure as opposed to the mandatory disclosure this case presents. Second, this court finds no mention of a Criminal Referral Form in any of the cases cited by Plaintiffs. Third, in no case that Plaintiffs cite is the § 3413(d) exception for mandatory disclosure even raised. See Neece v. IRS, 922 F.2d 573 (10th Cir.1990) (rejecting assertion of § 3413(c) exception in wake of voluntary disclosure); Liffiton v. Keuker, 850 F.2d 73, 79 (2d Cir.1988) (refusing to find § 3403(b) exception where bank disclosed more information than subpoena required); Duncan v. Belcher, 813 F.2d 1335, 1337 (4th Cir.1987) (holding that allegation of voluntary and improper disclosure of credit card records stated right of action under RFPA); United States v. Frazin, 780 F.2d 1461, 1465 n. 1 (9th Cir.) (rejecting application of § 3403(c) exception for voluntary disclosure), cert. denied, 479 U.S. 844, 107 S.Ct. 158, 93 L.Ed.2d 98 (1986); United States v. Whitty, 688 F.Supp. 48, 59 (D.Me.1988) (rejecting assertion of § 3404(c) defense where informal government policy was to request disclosure). In sum, the cases Plaintiffs provide state the obvious: where a bank's voluntary disclosure exceeds the quantum of information section 3403(c) allows, the bank is liable. In no way do these cases suggest that where disclosure is mandated by federal law, a bank may be held liable under the RFPA to the extent that such disclosure exceeds what is permissible under section 3403(c). Rather, this line of authority lends credence to the view of this court that mandatory disclosure, § 3413(d), and voluntary disclosure, § 3403(c), operate as independent exceptions to the requirements of the RFPA.
[8] Again, this conduct was mandated by federal regulations. The Criminal Referral Form requires a referring bank to "[r]elate key events and attach copies of those documents."
[9] At least one federal court has been faced with a similar quandary. In Young v. United States Department of Justice, 882 F.2d 633 (2d Cir. 1989), the Second Circuit was presented with a customer's claims of violation of the RFPA against a bank, as well as (what were then called pendent and now called supplemental) state law claims for breach of a confidential relationship. The Second Circuit affirmed the trial court's dismissal of the RFPA claims, and proceeded to address the state law claims.

After a thorough discussion of available precedent, the court concluded that state law did not answer the question of whether plaintiff's breach of confidentiality claim was viable. Recognizing that its own decision based on state precedent "would be little more than a guess," the court of appeals held that abstention was appropriate, citing Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Young, 882 F.2d at 643-44. The court dismissed the state law claims against the bank without prejudice with leave to refile in New York state court.
Young seems somewhat limited in precedential value as abstention under Colorado River is traditionally associated with dismissal of an action to allow resolution of a similar action pending in state court. See CHARLES A. WRIGHT, LAW OF FEDERAL COURTS § 52 at 335 (1994) (explaining confines of Colorado River abstention). The Young decision makes no mention of any similar pending claim in state court.
It is the view of this court that, in this case, the unsettled nature of Texas law justifies abstention, if at all, via certification. See Lehman Bros. v. Schein, 416 U.S. 386, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974). However, the Texas certification procedure is not available to a district court. See TEX.R.APP.P. 114(a). In the absence of a certification procedure, abstention on the basis of difficulty in determining state law is governed by the Supreme Court's decision in Meredith v. City of Winter Haven, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9 (1943). CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, 17A FEDERAL PRACTICE AND PROCEDURE § 4246 at 106 (2d. ed. 1988). In Meredith, the Court held that the uncertain nature of state law alone does not permit a federal court to decline to exercise jurisdiction in a case properly before it. 320 U.S. at 235, 64 S.Ct. at 11, 88 L.Ed. at 13-14. Consequently, this court will proceed to address the difficult issues of state law this case presents.